SLIP OPINION

Cite as 2016 Ark. 62

# SUPREME COURT OF ARKANSAS

No. CV–14–1105

COURTYARD GARDENS HEALTH AND REHABILITATION, LLC; SENIOR LIVING COMMUNITIES OF ARKANSAS, LLC; ARKANSAS SNF OPERATIONS ACQUISITION, LLC; ARKADELPHIA HOLDINGS, LLC; SLC PROFESSIONALS, LLC; ARKANSAS NURSING HOME ACQUISITION, LLC; SENIOR VANTAGE POINT, LLC; 2701 TWIN RIVERS DRIVE, LLC; SLC OPERATIONS MASTER TENANT, LLC; SLC PROFESSIONALS HOLDINGS, LLC; ADDIT, LLC; CSCV HOLDINGS, LLC; SLC OPERATIONS HOLDINGS, LLC; EOR-ARK, LLC; SLC OPERATIONS, LLC; VAJ, LLC; JERRY V. KEMPER; AND ANGELA MARLAR, IN HER CAPACITY AS ADMINISTRATOR OF COURTYARD GARDENS HEALTH AND REHABILITATION

APPELLANTS

V.

MALINDA ARNOLD, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JESSIE JAMES BULLOCK, DECEASED, AND AS ATTORNEY-IN-FACT OF ANNIE BULLOCK

APPELLEE

Opinion Delivered February 18, 2016

APPEAL FROM THE CLARK COUNTY CIRCUIT COURT [NO. 10CV-13-86]

HONORABLE ROBERT McCALLUM, JUDGE

REVERSED AND REMANDED.

**KAREN R. BAKER, Associate Justice**

SLIP OPINION

Appellants Courtyard Gardens Health and Rehabilitation, LLC and others[1] (collectively "Courtyard Gardens") appeal from a Clark County Circuit Court order denying its motion to dismiss and compel arbitration of claims brought against it by appellee Malinda Arnold, as personal representative of the Estate of Jessie James Bullock, deceased, and as attorney-in-fact of Annie Bullock.[2]

The complaint alleges that on approximately January 1, 2010, Jessie James Bullock was admitted to Courtyard Gardens, a nursing-home facility located in Arkadelphia, Arkansas. Mr. Bullock remained a resident of the facility until approximately April 10, 2012; he died on April 15, 2012. Mr. Bullock's wife, Annie Bullock, was admitted to Courtyard Gardens on approximately May 6, 2009, and remained a resident of the facility until approximately December 7, 2012. On June 18, 2009, Linda Gulley, the Bullocks' daughter, entered separate admission agreements and optional arbitration agreements on behalf of each parent. The arbitration agreement contained the following provision:

---

[1]Senior Living Communities of Arkansas, LLC; Arkansas SNF Operations Acquisition, LLC; Arkadelphia Holdings, LLC; SLC Professionals, LLC; Arkansas Nursing Home Acquisition, LLC; Senior Vantage Point, LLC; 2701 Twin Rivers Drive, LLC; SLC Operations Master Tenant, LLC; SLC Professionals Holdings, LLC; Addit, LLC; CSCV Holdings, LLC; SLC Operations Holdings, LLC; EOR-ARK, LLC; SLC Operations, LLC; VAJ, LLC; Jerry V. Kemper; and Angela Marlar, in her capacity as administrator of Courtyard Gardens Health and Rehabilitation.

[2]On January 23, 2007, Jessie Bullock executed his power of attorney and designated his daughters, Malinda Arnold and Linda Gulley, to act independently or jointly as his attorney-in-fact and agent. On January 7, 2010, Annie Bullock executed her power of attorney and designated her daughters, Malinda Arnold and Linda Gulley, to act independently or jointly as her attorney-in-fact and agent. On August 22, 2012, the Clark County Circuit Court entered an order appointing Malinda Arnold personal representative of the Estate of Jessie Bullock.

It is understood and agreed by Facility and Resident that any and all claims, disputes, and controversies (hereafter collectively referred to as a "claim" or collectively as "claims") arising out of, or in connection with, or relating in any way to the Admission Agreement or any service or health care provided by the Facility to the Resident shall be resolved exclusively by binding arbitration to be conducted at a place agreed upon by the Parties, or in the absence of such an agreement, at the Facility, in accordance with the National Arbitration Forum Code of Procedure, ("NAF") which is hereby incorporated into this Agreement, and not by a lawsuit or resort to court process. This agreement shall be governed by and interpreted under the Federal Arbitration Act, 9 U.S.C. Sections 1-16.

On July 25, 2013, Arnold filed a complaint against Courtyard Gardens in the Clark County Circuit Court. The complaint alleged negligence, medical malpractice, violations of the Long-Term Care Facility Residents' Rights Act, breach of the provider agreement, violations of the Deceptive Trade Practices Act, and negligence against appellant Angela Marlar, in her capacity as administrator of Courtyard Gardens. On August 27, 2013, Courtyard Gardens filed an answer to Arnold's complaint and reserved the right to enforce any applicable arbitration agreement after conducting an initial investigation to determine whether a valid arbitration agreement exists.

On December 23, 2013, Courtyard Gardens filed a motion to dismiss the complaint and compel arbitration. Courtyard Gardens argued that the arbitration agreement was valid and encompassed all of the claims in Arnold's complaint. On January 9, 2014, Arnold filed her response to the motion to dismiss and motion to compel arbitration. In her response, Arnold argued that the arbitration agreement was unenforceable based on impossibility of performance and unconscionability. Specifically, Arnold argued that the arbitration agreement was impossible to perform because the agreement selected the National Arbitration Forum ("NAF") to serve has arbitrator and the NAF is now unavailable because it had settled with

3

the Minnesota Attorney General and agreed to no longer conduct any arbitration pursuant to pre-dispute consumer agreements. On July 16, 2014, Courtyard Gardens filed a supplement to its motion to dismiss complaint and compel arbitration. Courtyard Gardens argued that the arbitration agreements only required arbitration in accordance with the NAF Code and did not select the NAF as the actual arbitrator. Further, Courtyard Gardens argued that the circuit court must compel arbitration based on the attached affidavit of Angela Marlar, who explained "Courtyard Gardens' overriding intent in entering these arbitration agreements is simply to have any and all disputes with a resident resolved through arbitration rather than litigation, regardless of the logistics." On July 25, 2014, Arnold filed her response to Courtyard Gardens' supplement. Arnold argued that Ms. Marlar's affidavit violated the parol-evidence rule because it contradicted the terms of the arbitration agreement.

On July 28, 2014, a hearing was held, and the circuit court denied the motion to compel arbitration. On August 29, 2014, the circuit court memorialized its findings in a written order. In denying Courtyard Gardens' motion to dismiss and motion to compel arbitration, the circuit court found that the parties had entered into a valid arbitration agreement and found that the arbitration agreement was not unconscionable. As to Arnold's defense of impossibility of performance, the circuit court found, as follows:

> The Arbitration Agreement is impossible to perform because it incorporates the National Arbitration Forum ("NAF") Code of Procedure. Rule 1 of the NAF Code of Procedure requires the NAF to serve as arbitrator of any disputes between the Plaintiff and Defendants. As such, the NAF Code of Procedure is an integral term of the Arbitration Agreement. Because the NAF is no longer in business and is unavailable to serve as arbitrator over this dispute, the Agreement is impossible to perform.

SLIP OPINION

On September 26, 2014, Courtyard Gardens filed its notice of appeal.

On appeal, Courtyard Gardens argues that the circuit court erred in finding that the arbitration agreement was unenforceable, thereby denying Courtyard Gardens' motion to compel arbitration. An order denying a motion to compel arbitration is an immediately appealable order under Arkansas Rule of Appellate Procedure–Civil 2(a)(12) (2015). We review a circuit court's order denying a motion to compel arbitration de novo on the record. *Searcy Healthcare Ctr., LLC v. Murphy*, 2013 Ark. 463, at 3 (citing *HPD, LLC v. Tetra Techs., Inc.*, 2012 Ark. 408, 424 S.W.3d 304).

The parties agree that the Federal Arbitration Act ("FAA") governs the arbitration agreement at issue. In *Regional Care of Jacksonville, LLC v. Henry*, we explained that Congress enacted the FAA, 9 U.S.C. §§ 1-16, to overcome judicial resistance to arbitration. 2014 Ark. 361, at 6, 444 S.W.3d 356, 360 (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006)). Section 2 of the FAA provides as follows:

> A written provision . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The Act, which rests on Congress' authority under the Commerce Clause, supplies not simply a procedural framework applicable in federal courts; it also calls for the application, in state as well as federal courts, of federal substantive law regarding arbitration. *Preston v. Ferrer*, 552 U.S. 346, 349 (2008) (citing *Southland Corp. v. Keating*, 465 U.S. 1, 16 (1984)). The primary purpose of the FAA is to ensure that private agreements to arbitrate are

5

SLIP OPINION

enforced according to their terms. *Volt Info. Sci., Inc. v. Bd. of Tr. of Leland Stanford Junior Univ.*, 489 U.S. 468 (1989). To this end, the Supreme Court recognizes that parties are generally free to structure their arbitration agreements as they see fit. *Id.* With the enactment of the FAA, Congress declared a national policy favoring arbitration when the parties contract for that mode of dispute resolution. *Preston*, 552 U.S. at 349 (citing *Southland Corp.* 465 U.S. at 16). In *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 468 (2015), the Court disapproved of the California Court of Appeal's interpretation of an arbitration clause because it resulted in the failure to place arbitration agreements "on equal footing with all other contracts." *Id.* (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. at 443). The *DIRECTV, Inc.* Court reasoned that the California court's decision failed to give "due regard . . . to the federal policy favoring arbitration." *Id.* at 471 (citing *Volt Info. Sci., Inc.*, 489 U.S. at 476+). Likewise, as a matter of public policy, arbitration is strongly favored in Arkansas. *Hart v. McChristian*, 344 Ark. 656, 42 S.W.3d 552 (2001). Arbitration is looked upon with approval as a less expensive and more expeditious means of settling litigation and relieving docket congestion. *Id.* Any doubts and ambiguities of coverage will be resolved in favor of arbitration. *Id.* In light of the public policy favoring arbitration, such agreements will not be construed strictly but will be read to include subjects within the spirit of the parties' agreement. *Id.*

Despite an arbitration provision being subject to the FAA, courts look to state contract law to determine whether the parties' agreement to arbitrate is valid. *GGNSC Holdings, LLC v. Chappel*, 2014 Ark. 545, 453 S.W.3d 645. The same rules of construction and

interpretation apply to arbitration clauses as apply to agreements generally. *Hart*, 344 Ark. 656, 42 S.W.3d 552. The construction and legal effect of a written contract to arbitrate are to be determined by the court as a matter of law. *Id.* Accordingly, we will give effect to the parties' intent as evidenced by the arbitration agreement itself. *Id.*

In *HPD, LLC v. Tetra Techs., Inc.*, we explained:

> In deciding whether to grant a motion to compel arbitration, two threshold questions must be answered. First, is there a valid agreement to arbitrate between the parties? Second, if such an agreement exists, does the dispute fall within its scope? In answering these questions, doubts about arbitrability must be resolved in favor of arbitration. Further, the court (rather than the arbitrator) decides these questions of arbitrability, unless the parties clearly and unmistakably delegate that issue to the arbitrator. Based on the principle that arbitration is a matter of contract, the question of "who has the primary power to decide arbitrability" turns upon what the parties agreed about that matter.

2012 Ark. 408, at 6, 424 S.W.3d 304, 308 (internal citations omitted). Here, the circuit court found that the "Arbitration Agreement is valid and encompasses the dispute at issue." The record demonstrates that the circuit court's ruling was correct.

## I. *Unavailability of the NAF*

The crux of the disagreement here is the unavailability of the NAF. The parties agree that the NAF is no longer conducting arbitrations of this type. In 2009, after the Attorney General of Minnesota filed an action alleging that the NAF had engaged in violations of consumer-protection laws, the NAF entered into a consent decree barring it from handling consumer arbitrations. *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665, 677 n.2 (2012) (Ginsburg, J., dissenting) (citing Press Release by Lori Swanson, Att'y Gen. of Minn. (July 19, 2009)).

On appeal, Courtyard Gardens asserts that the circuit court erred in finding that the arbitration agreement was unenforceable and denied its motion to compel arbitration. Specifically, Courtyard Gardens argues that the circuit court's decision to deny its motion based on impossibility of performance should be reversed. In response, Arnold argues that because the NAF is unavailable to arbitrate the dispute, the arbitration agreement is unenforceable based on the defense of impossibility of the performance.

Turning to whether the circuit court erred in finding that Arnold satisfied her burden of proving the affirmative defense of impossibility of performance, we are mindful of the United States Supreme Court's mandate that arbitration agreements be placed on "equal footing with all other contracts." *DIRECTV, Inc.*, 136 S. Ct. at 468. We are also mindful of our public policy in favor of arbitration. In *HPD, LLC v. TETRA Techs., Inc.*, we explained that

> [o]ur object is to ascertain the intention of the parties, not from particular words or phrases, but from the entire context of the agreement. It is well settled that a contract should be construed so that all of its parts are in harmony, if that is possible. In seeking to harmonize different clauses of a contract, we should not give effect to one to the exclusion of the other even though they seem conflicting or contradictory, nor adopt an interpretation which neutralizes a provision if the various clauses can be reconciled.

2012 Ark. 408, at 11, 424 S.W.3d at 310–11 (citations omitted). Here, the arbitration agreement provides in pertinent part,

> It is understood and agreed by Facility and Resident that any and all claims, disputes, and controversies (hereafter collectively referred to as a "claim" or collectively as "claims") arising out of, or in connection with, or relating in any way to the Admission Agreement or any service or health care provided by the Facility to the Resident shall be resolved exclusively by binding arbitration to be conducted at a place agreed upon by the Parties, or in the absence of such an agreement, at the Facility, in

accordance with the National Arbitration Forum Code of Procedure, ("NAF") which is hereby incorporated into this Agreement, and not by a lawsuit or resort to court process. This agreement shall be governed by and interpreted under the Federal Arbitration Act, 9 U.S.C. Sections 1-16.

. . . .

In the event a court having jurisdiction finds any portion of this agreement unenforceable, that portion shall not be effective and the remainder of the Agreement shall remain effective.

. . . .

**THE PARTIES UNDERSTAND AND AGREE THAT THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES, AND THAT BY ENTERING INTO THIS ARBITRATION AGREEMENT, THE PARTIES ARE GIVING UP AND WAIVING THEIR CONSTITUTIONAL RIGHT TO HAVE ANY CLAIM DECIDED IN A COURT OF LAW BEFORE A JUDGE AND A JURY, AS WELL AS ANY APPEAL FROM A DECISION OR AWARD OF DAMAGES.**

With regard to impossibility of performance, we have explained the standard to determine whether the defense of impossibility of performance is satisfied in *Frigillana v. Frigillana*, 266 Ark. 296, 584 S.W.2d 30 (1979):

The burden of proving impossibility of performance, its nature and extent and causative effect rests upon the party alleging it. He must show that he took virtually every action within his power to perform his duty under the contract. It must be shown that the thing to be done cannot be effected by any means. Resolution of the question requires an examination into the conduct of the party pleading the defense in order to determine the presence or absence of fault on his part in failing [to] perform.

*Id.* at 302–03, 584 S.W.2d at 33 (citations omitted). Further, we have drawn a "distinction between objective impossibility, which amounts to saying, '[t]he thing cannot be done,' and subjective impossibility[,] 'I cannot do it.'" *Christy v. Pilkinton*, 224 Ark. 407, 407, 273

S.W.2d 533, 533 (1954) (quoting Restatement (First) of Contracts § 455 cmt. a (1932)). Only cases involving objective impossibility of performance are excused. *Id.*

A review of Arkansas cases involving the defense of impossibility of performance demonstrates that the burden of proving impossibility is an exceedingly difficult standard to overcome. *See Smith v. Decatur Sch. Dist.*, 2011 Ark. App. 126 (defense of impossibility of performance was available where state or federal regulatory agency issued an order preventing performance of the contract and the contract could not be performed without violation of the governmental order); *Holton v. Cook*, 181 Ark. 806, 27 S.W.2d 1017 (1930) (incapacitation of appellee's daughter to pursue her studies rendered performance impossible and relieved appellee from liability for tuition and board for the balance of the year); *C.G. Davis & Co. v. Bishop*, 139 Ark. 273, 213 S.W. 744 (1919) (defense of impossibility of performance applied and excused the seller's liability in a contract for the sale of crops when weather conditions or matters outside the seller's control prevented him from delivering the number of crops contemplated by the contract).

Arnold argues that because the arbitration agreement incorporates the NAF Code and because the NAF Code can only be administered by the NAF, the arbitration agreement effectively selects the NAF as arbitrator. Thus, because the NAF is unavailable to arbitrate the dispute, the agreement is impossible to perform. To support her position, Arnold cites to Rule 1(A) of the NAF Code of Procedure. Rule 1(A) states, "This Code shall be administered only by the National Arbitration Forum or by any entity or individual providing

administrative services by agreement with the National Arbitration Forum."

Pursuant to *Frigillana*, Arnold bears the burden of proving that the arbitration agreement is impossible to perform.[3]  Arnold has clearly failed to satisfy her burden of proving impossibility of performance.  Stated differently, Arnold has failed to demonstrate that the agreement to arbitrate "cannot be effected by any means."  Rule 1(A) of the NAF Code of Procedure is qualified by Rule 48(C), which states that "[i]n the event a court of competent jurisdiction shall find any portion of this Code or Fee Schedule to be in violation of the law or otherwise unenforceable, that portion shall not be effective and the remainder of the Code shall remain effective."  *See Green v. U.S. Cash Advance Illinois, LLC*, 724 F.3d 787, 789 (7th Cir. 2013).  Thus, the NAF's Code of Procedure remains available even when the NAF is not serving as the arbitrator.  Further, Rule 48(D) of the NAF Code provides, "[i]f Parties are denied the opportunity to arbitrate a dispute, controversy or Claim before the Forum, the Parties may seek legal and other remedies in accord with applicable law."  Arnold also cites to Rule 48(E), which states that "[i]n the event of a cancellation of this Code, any Party may seek legal and other remedies regarding any matter upon which an Award or Order has not been entered."  However, Arnold has failed to offer proof that the NAF Code has been

---

[3]Arnold contends that because the NAF Code of Procedure is incorporated into the agreement, it adds 85 pages of additional terms to the arbitration agreement.  However, we note that Arnold only introduced Rules 1, 2, and 48 of the NAF Code into the record.  Arnold invites this court to look outside the record by stating that the NAF Code of Procedure is available at http://www.arb–forum.com.  Matters outside the record will not be considered in making a ruling on appeal.  *See Estates of Seay v. Quinn*, 352 Ark. 113, 98 S.W.3d 821 (2003).

cancelled. In reviewing the applicable law identified by the parties in their agreement, the agreement states that it "shall be governed by and interpreted under the Federal Arbitration Act, 9 U.S.C. Sections 1-16." Section 5 of the FAA specifically contemplates the possibility that a designated arbitrator may be unavailable to arbitrate the dispute and requires the appointment of a substitute arbitrator when the NAF is unavailable:

> If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or *if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire*, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

9 U.S.C. § 5 (emphasis added). Thus, section 5 applies, and the circuit court "shall" appoint an arbitrator. Applying a de novo review to the circuit court's findings, and after careful review of the arbitration agreement, we hold that the arbitration agreement is not unenforceable based on the defense of impossibility of performance.

## II. *Integral-Term versus Ancillary-Logistical-Concern Test*

Further, the integral-term versus ancillary-logistical-concern test employed by the parties supports this court's decision that Arnold has failed to satisfy her burden of proving the defense of impossibility of performance. As noted above, the FAA governs the arbitration agreement at issue. The majority of courts that have addressed whether a substitute arbitrator can be appointed pursuant to section 5 of the FAA have utilized the approach set out in *Brown*

SLIP OPINION

*v. ITT Consumer Financial Corp.*, 211 F.3d 1217 (11th Cir. 2000). In *Brown*, the court focused its inquiry on whether the reference to the arbitral forum named in the arbitration agreement was integral to the parties' decision to arbitrate or merely a logistical ancillary concern. *Id.* at 1222. Only if the choice of forum is an integral part of the agreement to arbitrate, rather than an ancillary logistical concern will the failure of the chosen forum preclude arbitration. *Id.* "This question has vexed courts across the country and resulted in a substantial split of authority." *Meskill v. GGNSC Stillwater Greeley, LLC*, 862 F. Supp.2d 966, 972 (D. Minn. 2012). In *Brown*, the court held that "there is no evidence that the choice of the NAF as the arbitration forum was an integral part of the agreement to arbitrate. Brown's argument that the arbitration agreement is void because the NAF was unavailable must fail." 211 F.3d at 1222. *See also Kahn v. Dell*, 669 F.3d 350 (3rd Cir. 2012) (designation of the NAF as arbitrator is not "integral" to arbitration agreements and § 5 may be used to appoint a substitute arbitrator); *Meskill*, 862 F. Supp. 2d 966 (holding that the unavailability of the NAF could be remedied by appointing a substitute arbitrator under the FAA, because the designation of the NAF was not integral to the agreement); but see, *Miller v. GGNSC Atlanta, LLC*, 323 Ga. App. 114, 746 S.E.2d 680 (2013) (the availability of the NAF Code and, consequently, the availability of the NAF as an arbitral forum, are integral to the agreement); *Carideo v. Dell, Inc.*, C06-1772JLR, 2009 WL 3485933 (W.D. Wash. Oct. 26, 2009) (the parties' selection of the NAF as arbitrator is integral to the arbitration clause).

Here, for the reasons that follow, we hold that the NAF term was merely an ancillary

13

logistical concern and that section 5 of the FAA applies and provides a procedure for the appointment of a substitute arbitrator. First, the "binding arbitration" language, as bolded and capitalized in the arbitration agreement does not mandate that claims be arbitrated with the NAF; rather it requires arbitration as the sole means of resolving the claims. The fact that the NAF term is absent from the bolded and capitalized language supports the determination that it was the parties' intent to resolve their disputes through binding arbitration regardless of the availability of the NAF.

Second, the mandatory language in the arbitration agreement, "shall," applies to arbitration, not the NAF or a particular arbitrator. The arbitration agreement states that the dispute "shall be resolved exclusively by binding arbitration to be conducted at a place agreed upon by the Parties, or in the absence of such an agreement, at the Facility, in accordance with the National Arbitration Forum Code of Procedure, ("NAF") which is hereby incorporated into this Agreement, and not by a lawsuit or resort to court process. This agreement shall be governed by and interpreted under the Federal Arbitration Act, 9 U.S.C. Sections 1-16." A review of the arbitration agreement demonstrates that the integral term of the arbitration agreement is "arbitration," not the "NAF" as an arbitrator. *Meskill*, 862 F. Supp. 2d at 976 (citing *Diversicare Leasing Corp. v. Nowlin*, No. 11-CV-1037, 2011 WL 5827208, at *6 (W.D. Ark. Nov. 18, 2011) ("lack of focus" on the NAF due to it being mentioned only once in three-page arbitration agreement "evidence[s] that the NAF was not a primary concern of the parties"). Thus, minimal reference to the NAF in this arbitration

agreement undermines Arnold's argument that the NAF term was integral to the parties' agreement to arbitrate.

Third, as stated previously, the arbitration agreement requires the use of the NAF's Code of Procedure, not that the NAF itself is required to conduct the arbitration. In *Green*, in interpreting an arbitration agreement in favor of arbitration, the court explained, "[i]f [the agreement] were designed to require arbitration to be conducted by the [NAF] exclusively, the reference to its Code would be surplusage; the only reason to refer to the Code is to create the possibility of arbitration outside the [NAF]'s auspices, but using its rules of procedure." 724 F.3d at 789. Here, the reference to the NAF Code of Procedure and the accompanying footnote are the only references to the NAF in this arbitration agreement. *Robinson v. EOR-ARK, LLC*, No. 1:14-CV-01051, 2015 WL 5684140, at *1 (W.D. Ark. Sept. 28, 2015) (in granting the motion to compel arbitration and interpreting identical language, the court noted that "the agreement's only mention of the NAF is in reference to the NAF Code of Procedure incorporated into the agreement and reference in a footnote"). By "invoking only the Code and not the NAF itself, the agreement suggests that the parties anticipated an entity other than the NAF might conduct the arbitration." *Id.* (citing *Meskill*, 862 F. Supp. 2d at 973). Thus, reference to the NAF Code of Procedure, rather than the NAF itself, further supports the conclusion that the NAF term was a mere ancillary concern.

Fourth, the arbitration agreement contains a severability clause, which further evidences the parties' intent to arbitrate even if a portion of the arbitration agreement is

unenforceable. The severability clause states, "In the event a court having jurisdiction finds any portion of this agreement unenforceable, that portion shall not be effective and the remainder of the Agreement shall be effective." In *Nowlin*, the court explained that the agreement contains a "severance provision that clearly allows for arbitration to go forward even where a portion of the agreement is held to be indefinite or invalid." *Id*. at *6. The court further found that "the severance provision indicates that the intention was not to make the [designated forum] integral, but rather to have a dispute resolution process through arbitration." *Id*. (citing *Jones v. GGNSC Pierre LLC*, 684 F. Supp. 2d 1161, 1167 (D.S.D. 2010)). Further, in seeking to harmonize the severance clause with the other clauses contained in the contract, as required by *HPD, LLC, supra*, the severance clause operates to remove the unenforceable provision of the agreement. Here, the unenforceable language relates to the NAF as arbitrator. Once this unenforceable language is severed from the arbitration agreement, the parties must be compelled to resolve their dispute through arbitration.

As we held in *HPD, LLC*, "our object is to ascertain the intention of the parties . . . from the entire context of the agreement." 2012 Ark. 408, at 11, 424 S.W.3d at 310–11. Based on the intention of the parties as expressed in the arbitration agreement, and in order to give effect to the arbitration requirement, the sole purpose of the parties' agreement, we hold that the NAF term is merely an ancillary logistical concern and is severable. Therefore, in light of our public policy in favor of arbitration and the requirement that doubts about

arbitrability be resolved in favor of arbitration, we hold that the circuit court erred in denying Courtyard Gardens' motion to compel arbitration based on impossibility of performance.[4] We reverse and remand for the entry of an order compelling arbitration.

Reversed and remanded.

DANIELSON and WYNNE, JJ., and Special Justice RYAN ALLEN dissent.

WOOD, J., not participating.

**PAUL E. DANIELSON, Justice, dissenting.** I respectfully dissent. Other jurisdictions have been presented with the issue whether arbitration agreements between nursing homes and residents are rendered unenforceable when the chosen forum is unavailable. I recognize that there is a substantial split of authority on the issue. *See, e.g.*, *Meskill v. GGNSC Stillwater Greeley LLC*, 862 F. Supp. 2d 966 (D. Minn. 2012); *Wert v. Manorcare of Carlisle PA, LLC*, 124 A.3d 1248 (Pa. 2015); *Miller v. GGNSC Atlanta, LLC*, 746 S.E.2d 680 (Ga. Ct. App. 2013). While the majority accepts the arguments advanced by the nursing home in this case, I am not convinced by those arguments, nor am I persuaded by those cases from other jurisdictions compelling arbitration despite the unavailability of the designated arbitrator. Rather than point out deficiencies in the majority's analysis, I simply set out my own analysis.

---

[4]On appeal, Arnold challenges the circuit court's ruling that the "Arbitration Agreement applies to Plaintiff's claims in her Complaint against Defendants, not just Plaintiff's claims against Courtyard Gardens Health and Rehabilitation, LLC." However, Arnold did not file a notice of cross-appeal. A notice of cross-appeal is necessary when an appellee seeks something more than it received in the lower court. *Moose v. Gregory*, 267 Ark. 86, 590 S.W.2d 662 (1979). Further, on interlocutory appeal this court does not review rulings in favor of compelling arbitration. *See Searcy Healthcare, LLC v. Murphy*, 2013 Ark. 463. Therefore, we decline to address Arnold's argument on appeal.

For the reasons that follow, I would affirm the circuit court's ruling that the arbitration agreement in this case is impossible to perform.

This court has stated that whether an arbitration agreement is unenforceable based on a generally applicable contract defense is a question of state contract law. *See LegalZoom.com, Inc. v. McIllwain*, 2013 Ark. 370, 429 S.W.3d 261 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967)). Under Arkansas law, the burden of proving impossibility of performance rests upon the party alleging it. *See Ark. Realtors Ass'n v. Real Forms, LLC*, 2014 Ark. 385, 442 S.W.3d 845 (citing *Frigillana v. Frigillana*, 266 Ark. 296, 584 S.W.2d 30 (1979)). In order to prove the defense, it must be shown that the thing to be done cannot be effected by any means. *See id.*

First, the appellants reject the basic premise of Arnold's position: that the arbitration agreement selects the National Arbitration Forum ("NAF") as arbitrator. As the majority notes, the arbitration agreement provides that any and all claims "shall be resolved exclusively by binding arbitration to be conducted . . . in accordance with the National Arbitration Forum Code of Procedure, ('NAF') which is hereby incorporated into this Agreement, and not by a lawsuit or resort to court process." The NAF Code of Procedure states as follows in Rule 1(A): "This Code shall be administered only by the National Arbitration Forum or by any entity or individual providing administrative services by agreement with the National Arbitration Forum." According to Arnold, because the arbitration agreement incorporates the NAF Code, and because the NAF Code can only be administered by the NAF, the

arbitration agreement effectively selects the NAF as arbitrator. I agree.

It is axiomatic that arbitration agreements must be enforced according to their terms. *See, e.g.*, *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468 (1989). Furthermore, under Arkansas law, arbitration is simply a matter of contract between parties. *See, e.g.*, *Courtyard Gardens Health & Rehab., LLC v. Quarles*, 2013 Ark. 228, 428 S.W.3d 437. We have held that the same rules of construction and interpretation apply to arbitration agreements as to agreements generally; thus, we will seek to give effect to the intent of the parties as evidenced by the arbitration agreement itself. *See id.* Pursuant to the terms of the arbitration agreement in this case, the parties agreed to arbitrate their disputes in accordance with the NAF Code. The NAF Code, which is part of the arbitration agreement by virtue of incorporation, clearly states that it shall be administered only by the NAF. I note the appellants' attempt to distinguish between administration of an arbitration, as phrased in Rule 1(A), and the actual arbitration of a dispute. In my view, this is a distinction without a difference. The NAF is not a person; thus, it cannot literally arbitrate a dispute, but, if it were still available, it could administer an arbitration and, in doing so, select an individual arbitrator or panel of arbitrators to preside.

This conclusion is supported by persuasive authority. In cases interpreting arbitration agreements identical to the one at issue here, several courts have held that the designation of the NAF Code is synonymous with designating the NAF as arbitrator in light of Rule 1(A)'s statement that the Code shall be administered only by the NAF. *See, e.g.*, *Miller*, 746 S.E.2d

19

680 (stating that the arbitration agreement designated the NAF as the parties' exclusive arbitral forum); *see also Wert*, 124 A.3d 1248; *GGNSC Tylertown, LLC v. Dillon ex rel. Hargrove*, 87 So. 3d 1063 (Miss. Ct. App. 2011); *Stewart v. GGNSC-Canonsburg, L.P.*, 9 A.3d 215 (Pa. Super. Ct. 2010). Courts interpreting similar but not identical language have also concluded that the designation of a particular arbitral forum's rules is the same as designating an arbitrator. *See, e.g.*, *Ranzy v. Tijerina*, 393 F. App'x 174 (5th Cir. 2010) (per curiam); *Apex 1 Processing, Inc. v. Edwards*, 962 N.E.2d 663 (Ind. Ct. App. 2012); *Rivera v. Am. Gen. Fin. Servs., Inc.*, 259 P.3d 803 (N.M. 2011).

I acknowledge that other courts have reached the opposite conclusion. For example, in *Robinson v. Eor-Ark, LLC*, No. 1:14–CV–01051, 2015 WL 5684140 (W.D. Ark. Sept. 28, 2015), *Meskill*, 862 F. Supp. 2d 966, and *Jones v. GGNSC Pierre LLC*, 684 F. Supp. 2d 1161 (D. S.D. 2010), all of which involved arbitration agreements identical to the one at issue in this case, federal district courts rejected the proposition that the "in accordance with" language effectively selected the NAF as arbitrator. These courts focused on the fact that the arbitration agreement "invok[ed] only the Code and not the NAF itself." *Meskill*, 862 F. Supp. 2d at 973. I am not persuaded by this reasoning, however, because it fails to account for the fact that the arbitration agreement incorporates the NAF Code and thus includes an express statement that only the NAF can administer it. In *Wright v. GGNSC Holdings LLC*, 808 N.W.2d 114, 120 (S.D. 2011), another case involving an identical arbitration agreement, the Supreme Court of South Dakota discounted the significance of Rule 1(A), stating that a

different arbitral forum could apply the NAF's "rules of procedure," even though it could not administer the NAF Code. I am similarly unpersuaded by this analysis. As another court put it, the *Wright* court's conclusion that any arbitrator could administer the public rules governing arbitration in place of the NAF rules "is not what the parties in *Wright* said in their agreement, and the court's decision essentially rewrote the agreement." *Riley v. Extendicare Health Facilities, Inc.*, 826 N.W.2d 398, 407 (Wis. Ct. App. 2012). Finally, the Seventh Circuit has also rejected reliance on Rule 1(A), holding that its exclusivity claim is "unenforceable" because "no author can control how or by whom a written work is used." *Green v. U.S. Cash Advance Ill., LLC*, 724 F.3d 787, 789–90 (7th Cir. 2013). But *Green* is distinguishable from the case at bar: there, the arbitration agreement did not incorporate the NAF Code, meaning the language of Rule 1(A) was not technically part of the parties' agreement.

In sum, the better interpretation is that the designation of a particular arbitral forum's rules, and the incorporation of those rules into the arbitration agreement, are synonymous with designating that forum as arbitrator, especially when those rules cannot be applied by a different forum. This best comports with the requirements that we enforce arbitration agreements in accordance with their terms, *see Volt Info.*, 489 U.S. 468, and that we give effect to the parties' intent as evidenced by the agreement itself, *see Quarles*, 2013 Ark. 228, 428 S.W.3d 437. For these reasons, I would hold that the arbitration agreement in this case effectively selects the NAF as arbitrator.

My analysis does not end there, however, because the appellants argue that the Federal Arbitration Act ("FAA") requires appointment of a substitute arbitrator when a selected arbitrator becomes unavailable. There is no dispute that the FAA as a whole applies in this case; the parties agreed to it in the arbitration agreement, and they do not dispute it now. *See Pest Mgmt., Inc. v. Langer*, 369 Ark. 52, 250 S.W.3d 550 (2007) (citing *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265 (1995)) (stating that the FAA applies to a transaction involving interstate commerce). While the interpretation of an arbitration agreement is generally a matter of state law, the FAA imposes certain rules of fundamental importance. *See, e.g.*, *Rivera*, 259 P.3d 803 (citing *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010)). To determine whether the arbitration agreement is enforceable, we must consider not only general principles of Arkansas contract law but also substantive federal case law interpreting the FAA. *See id.*

Section 5 of the FAA provides that, where the chosen arbitral forum is unavailable or has failed for some reason, a substitute arbitrator may be named. *See Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217 (11th Cir. 2000). The Eleventh Circuit has articulated a test for determining when section 5 applies: "Only if the choice of forum is an integral part of the agreement to arbitrate, rather than an 'ancillary logistical concern' will the failure of the chosen forum preclude arbitration." *Id.* at 1222. In other words, where the language of the arbitration agreement reflects that the choice of arbitral forum is an "integral part" of the agreement, then the agreement will be considered unenforceable if the forum is unavailable.

*See Miller*, 746 S.E.2d at 685. If, on the other hand, the agreement shows that the selection of a particular forum was merely an "ancillary logistical concern," section 5 will apply and a substitute arbitrator may be named. *See id*. The reason for this distinction was explained in *Jones*:

> When the reference to arbitration rules or an arbitration forum is merely "an ancillary or logistical concern," the application of Section 5 to appoint a different arbitrator does not do violence to the intentions of the parties. By contrast, when the choice of arbitration forum was integral to the agreement, such that the parties would not have agreed upon arbitration absent the selected forum, application of Section 5 to appoint a substitute arbitrator is more problematical. After all, despite the "liberal federal policy favoring arbitration agreements," the Court must be mindful of the parties' intentions as expressed in the terms of an arbitration agreement.

684 F. Supp. 2d 1161, 1166 (internal citations omitted).

The "integral term vs. ancillary logistical concern" test articulated in *Brown* has been adopted by a large majority of jurisdictions and is the generally accepted way to analyze the application of section 5. *See Miller*, 746 S.E.2d 680; *Diversicare Leasing Corp. v. Nowlin*, No. 11-CV-1037, 2011 WL 5827208 (W.D. Ark. 2011). It has not yet been adopted in Arkansas, but it is consistent with Arkansas contract law, in that it focuses on and requires a court to give effect to the intent of the contracting parties, as evidenced by the contract's language. *See Quarles*, 2013 Ark. 228, 428 S.W.3d 437. It is also consistent with the terms of the FAA as well as United States Supreme Court precedent, which require courts to enforce arbitration agreements according to their terms. *See Volt Info.*, 489 U.S. 468; *Miller*, 746 S.E.2d 680 (citing 9 U.S.C. §§ 2, 3, 4).

In support of their argument that the designation of the NAF was merely an ancillary

logistical concern, the appellants contend that the arbitration agreement demonstrates that the parties' paramount goal was to have their disputes resolved by arbitration rather than litigation. Conversely, Arnold argues that the parties did not have a general agreement to arbitrate; instead, they agreed to arbitrate only before the NAF. Therefore, she maintains, the designation of the NAF is an integral term of the arbitration agreement. The parties discuss the following factors in support of their respective positions.

*Express Applicability of the FAA*

First, the appellants point out that both the arbitration agreement and the NAF Code expressly state that they are to be interpreted under the FAA, which would include section 5. According to the appellants, this suggests that, to the extent the parties intended to select the NAF as arbitrator, they nonetheless contemplated the possibility that the NAF would not arbitrate and that a substitute arbitrator would need to be named. I disagree with this interpretation. Many arbitration agreements provide that they are to be governed by and interpreted under the FAA, but there is no evidence in this case to suggest that the parties considered the effect of section 5. Therefore, I would not consider the inclusion of this language persuasive on the issue of whether the designation of the NAF is an integral term.

Cite as 2016 Ark. 62

*Allowance for Further Agreement of the Parties*

Second, the appellants aver that both the arbitration agreement and the NAF Code allow for further agreement of the parties regarding the rules, procedures, and logistics of arbitration. Specifically, the arbitration agreement states that arbitration would occur "at a place agreed upon by the Parties, or in the absence of such an agreement, at the Facility." Rule 1(A) of the NAF Code provides that parties may "agree to other procedures," and Rules 48(D) and (E) state that parties "may seek legal and other remedies" in the event that they are denied the opportunity to arbitrate or in the event of cancellation of the Code. The appellants argue that this language demonstrates that the emphasis for the parties was arbitration instead of litigation, not arbitration conducted by a particular forum.

I disagree. The arbitration agreement allows for further agreement of the parties only with respect to the place where arbitration would be conducted. Furthermore, the provisions of the NAF Code relied on by the appellants actually support Arnold's position. They state as follows:

> D. The Director or Arbitrator may decline the use of arbitration for any dispute, controversy, Claim, Response or Request that is not a proper or legal subject matter for arbitration or where the agreement of the Parties has substantially modified a material portion of the Code. If Parties are denied the opportunity to arbitrate a dispute, controversy or Claim before the Forum, the Parties may seek legal and other remedies in accord with applicable law.

> E. In the event of a cancellation of this Code, any Party may seek legal and other remedies regarding any matter upon which an Award or Order has not been entered.

As the Georgia Court of Appeals held in *Miller*, the portion of Rule 48(D) providing that the

NAF may decline to arbitrate the parties' claims if their agreement has "substantially modified a material portion of the Code" shows that, unless the NAF Code in its entirety applies to the arbitration, the parties' agreement to arbitrate may be unenforceable. 746 S.E.2d 680. This language demonstrates that both the NAF and its Code are an essential part of the agreement to arbitrate. *See id*. In addition, "both Rules 48(D) and (E) make clear that if the parties cannot arbitrate pursuant to the NAF Code (which itself requires arbitration by the NAF), they are not obligated to arbitrate in an alternate forum." *Id*. at 687. Instead, they are free to seek legal remedies, which would include litigation. *See id*. The Eleventh Circuit has recently held similarly. *See Beverly Enters. Inc. v. Cyr*, 608 F. App'x 924, 925 (11th Cir. 2015) (per curiam) (holding that the parties, by incorporating the NAF Code into their arbitration agreement, agreed that they could pursue legal and other remedies if the Code was cancelled, which "is what [the plaintiff] is doing").

I agree with the *Miller* and *Cyr* analysis. In essence, the parties agreed that they could pursue legal remedies if arbitration before the NAF became impossible. This is a significant consideration and severely undercuts the appellants' argument that the parties' overriding concern was arbitration rather than litigation.

*References to the NAF and Permissive/Mandatory Language*

Third, the appellants point to the specific language used in the arbitration agreement's designation of the NAF. Other jurisdictions have focused on the number of references to the designated arbitral forum in deciding whether that designation was an integral term of the

arbitration agreement. For example, in both *Meskill*, 862 F. Supp. 2d 966, and *Diversicare*, 2011 WL 5827208, a single mention of the NAF was considered evidence that the NAF was not a primary concern of the parties when making the decision to arbitrate. *See also Rivera*, 259 P.3d 803, 815 ("pervasive references" to the NAF in the arbitration agreement compelled a conclusion that the parties intended for the NAF to be the exclusive arbitrator). The appellants assert that the arbitration agreement in this case barely mentions the NAF, but this argument overlooks the fact that the NAF Code is incorporated into the agreement. Consequently, the terms of the NAF Code became terms of the arbitration agreement itself, resulting in pervasive references to the NAF within the arbitration agreement.[5]

Other jurisdictions have also focused on whether an arbitration agreement uses permissive or mandatory language in selecting an arbitral forum or its rules. The arbitration agreement at issue here states that any disputes between the parties "*shall* be resolved *exclusively* by binding arbitration" conducted in accordance with the NAF Code. (Emphasis added.) Several courts have held that this mandatory language, combined with the incorporation of the NAF Code, indicates that the parties did not have a general agreement to arbitrate but contracted to arbitrate only before the NAF. *See, e.g.*, *Miller*, 746 S.E.2d 680. *See also Rivera*, 259 P.3d at 813 ("Mandatory, as opposed to permissive, contractual language further demonstrates that a specifically named arbitration provider is integral to the agreement to arbitrate.").

---

[5]The same was true in *Meskill*, but that court seemed to ignore the incorporation provision. Unlike the majority, I would decline to do the same.

I note the appellants' contention that the word "exclusively" was intended to modify "shall be resolved," not "in accordance with the National Arbitration Forum Code of Procedure." I also note that the arbitration agreement uses permissive language in addition to the above-quoted mandatory language, stating in a footnote that "[c]laims *may* be filed" at an NAF office or via its website or mailing address. (Emphasis added.) Thus, in my analysis, I do not give great weight to the permissive or mandatory character of the language used. However, I maintain that the numerous references to the NAF throughout the arbitration agreement support Arnold's position that the designation of the NAF is an integral term.

## *Implicit/Explicit Selection*

Fourth, the appellants contend that, if the parties had wished to qualify their agreement to arbitrate on the availability of the NAF, the agreement would have explicitly stated as much, rather than "obliquely" selecting the NAF Code. As discussed previously in this dissent, some courts have held that the designation of a particular arbitral forum's rules of procedure is not synonymous with selecting that forum as arbitrator. In *Dean v. Heritage Healthcare of Ridgeway, LLC*, 759 S.E.2d 727 (S.C. 2014), the South Carolina Supreme Court discussed the distinction between arbitration agreements requiring a proceeding "administered by" the named forum and those requiring a proceeding conducted "in accordance with" the named forum's rules. The court held that, absent other evidence to the contrary, a forum selection achieved by "in accordance with" language is merely an ancillary logistical concern

for purposes of deciding whether section 5 applies, while one achieved with "administered by" language is an integral term. *Id.*

The arbitration agreement in the instant case provides that arbitration is to be conducted "in accordance with" the NAF Code, which may be characterized as an implicit, rather than explicit, selection of the NAF pursuant to the *Dean* reasoning. However, there is no indication in *Dean* that the rules of procedure referenced in the arbitration agreement were incorporated into the arbitration agreement. This is a critical distinction. As I have stated, I would decline to follow those cases holding that an arbitration agreement invokes only the NAF Code but not the NAF itself when, in fact, the NAF Code is incorporated into the agreement and explicitly states that it may be administered only by the NAF. *See, e.g.*, *Robinson*, 2015 WL 5684140; *Meskill*, 862 F. Supp. 2d 966; *Jones*, 684 F. Supp. 2d 1161. In my view, the better reasoning is that espoused by the Eleventh Circuit in *Cyr*, 608 F. App'x 924, which involved an arbitration agreement identical to the one at issue here. As that court held, "the agreement *explicitly* incorporates the NAF code, making the code an *essential part* of the agreement." *Id.* at 925 (emphasis added).

*Severance Clauses*

Fifth, the appellants point out that both the arbitration agreement and the NAF Code include severance provisions. Some courts have held that the existence of a severance clause in an arbitration agreement is "evidence that the parties did not intend for the entire agreement to fail if one portion was invalid or unenforceable" and therefore indicates that the

selection of an arbitral forum is not an integral term. *Jones*, 684 F. Supp. 2d at 1168. *See also*

*Diversicare*, 2011 WL 5827208.

Other courts have criticized the reasoning in *Jones* on this point, stating that it

"erroneously concluded that the severability clause trumped the plain language of the contract

designating the NAF as the exclusive forum to arbitrate claims." *Stewart*, 9 A.3d at 220. *See*

*also Miller*, 746 S.E.2d 680; *Rivera*, 259 P.3d 803. These cases focus on the intent of the

parties and, specifically, the plain language of the arbitration agreement as the principal

evidence of their intent. They conclude that a term intended to be integral to an agreement

cannot be severed from the agreement. This is the better view, in my opinion, because it

comports with our precedent requiring that we give effect to the intent of the parties as

evidenced by the arbitration agreement itself. *See, e.g.*, *Quarles*, 2013 Ark. 228, 428 S.W.3d

437. As the New Mexico Supreme Court explained,

> Given the number of references to the NAF as the only named arbitrator and the substantial reliance on the NAF *Code of Procedure* throughout the contract, we could not sever the unenforceable terms of the arbitration provisions without substantially rewriting the contract. Where the NAF involvement in the arbitration provisions is so integral to the agreement itself, for us to change those core provisions would violate our duty to enforce the agreement according to its terms.

*Rivera*, 259 P.3d at 815. Accordingly, the severance clause in the instant arbitration agreement

cannot override the fact that the selection of the NAF is an integral part of the agreement.

*See Stewart*, 9 A.3d 215; *Wert*, 124 A.3d 1248.

*Ambiguity/Parol Evidence*

Finally, the appellants argue that, to the extent that the plain language of the arbitration

agreement is ambiguous, the only other evidence in the record regarding the parties' intent

is Angela Marlar's affidavit, which indicated that Courtyard Gardens did not intend to select

the NAF as arbitrator, and which Arnold did not counter. First, I note that the circuit court

did not find the arbitration agreement to be ambiguous. Second, cases emphasizing the plain

language of the arbitration agreement as the sole evidence of the parties' intent are more

persuasive than cases placing "undue focus on extrinsic and/or collateral evidence of the

parties' intent." *Stewart*, 9 A.3d at 221. This is because, under Arkansas contract law, the

written agreement itself is the best evidence of the intent of the parties. *See, e.g.*, *Hurt-Hoover*

*Invs., LLC v. Fulmer*, 2014 Ark. 461, 448 S.W.3d 696. Therefore, I do not find the parol

evidence to be a significant consideration in deciding whether section 5 applies.

Considering all of these factors together, I am compelled to conclude that the

designation of the NAF is an integral term of the parties' arbitration agreement. I attach

particular significance to the incorporation of the NAF Code into the agreement and the

language of Rules 48(D) and (E), which essentially explain that the parties are not obligated

to arbitrate in an alternate forum. My position may be summarized as follows:

> As the foregoing demonstrates, the Arbitration Agreement by its terms provides that the procedural law governing the arbitration proceedings would be the NAF Code; that the arbitrators would be members of the NAF, who are the only people authorized to administer and apply the NAF Code; and that in the absence of the NAF and/or the NAF Code as written, the parties would not be obligated to arbitrate their disputes but instead would be free to seek legal remedies. Accordingly, we find that the availability of the NAF Code of Procedure and, consequently, the availability of NAF as an arbitral forum, are integral to the Arbitration Agreement.

*Miller*, 746 S.E.2d at 688. Because the designation of the NAF is an integral part of the

Cite as 2016 Ark. 62

arbitration agreement, section 5 does not apply. The unavailability of the NAF renders the parties' arbitration agreement impossible to perform; consequently, it is unenforceable.

I acknowledge the liberal federal policy favoring arbitration agreements. *See, e.g.*, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983). However, this policy does not allow us to rewrite the parties' agreement; rather, the law obligates us to enforce the plain terms of the contract into which the parties entered. *See Miller*, 746 S.E.2d 680 (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995)). In accordance with this obligation, I would affirm the circuit court's finding that the arbitration agreement in this case is impossible to perform.

WYNNE, J., and Special Justice RYAN ALLEN join in this dissent.

*Kutak Rock, LLP*, by: *Mark W. Dossett* and *Samantha B. Leflar*, for appellants.

*Campbell Law Firm, P.A.*, by: *H. Gregory Campbell*; and *Reddick Moss, PLLC*, by: *Brian D. Reddick* and *Robert W. Francis*, for appellee.